**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-1590, No. 23-1591, 23-3045

_____

PUBLIC INTEREST LEGAL FOUNDATION
Appellant in 23-1591
v.

SECRETARY COMMONWEALTH OF
PENNSYLVANIA;
JONATHAN M. MARKS, in his official capacity as
Deputy Secretary for Elections and Commissions;
BUREAU OF COMMISSIONS ELECTIONS &
LEGISLATION

Secretary Commonwealth of Pennsylvania;
Jonathan M. Marks,
Appellants in 23-1590 & 23-3045

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No.: 1:19-cv-00622)
District Judge: Hon. Christopher C. Conner

_____

Argued
September 11, 2024

(Filed: April 25, 2025)

Before:  CHAGARES, *Chief Judge*, ROTH, and RENDELL,
*Circuit Judges*.

Daniel T. Brier
Donna A. Walsh [Argued]
Myers Brier & Kelly
425 Biden Street
Suite 200
Scranton, PA 18503

      Counsel for Appellants

Linda A. Kerns
Suite 200
1420 Locust Street
Philadelphia, PA 19102

Noel H. Johnson [Argued]
Public Interest Legal Foundation
320 N Meridian Street
Suite 912
Indianapolis, IN 46204

Kaylan L. Phillips
Public Interest Legal Foundation
107 S West Street
Suite 700
Alexandria, VA 22314

      Counsel for Appellee

Noah Bokat-Lindell [Argued]
United States Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
Ben Franklin Station
Washington, DC 20044

> Counsel for Amicus Appellee – United States of America

James F. Peterson
425 Third Street, S.W.
Suite 800
Washington, DC 20024

> Counsel for Amicus Appellee – Judicial Watch Inc.

Jonathon P. Hauenschild
4201 Wilson Boulevard
Suite 110-315
Arlington, VA 22203

> Counsel for Amicus Appellee – Lawyers Democracy Fund

Brian C. Frontino
Matthew D. Klayman
John P. Lavelle, Jr.
Morgan Lewis & Bockius
2222 Market Street
12th Floor
Philadelphia, PA 19103

Counsel for Amicus Appellant – League of
Women Voters of Pennsylvania

———————

OPINION OF THE COURT

———————

RENDELL, *Circuit Judge.*

The Public Interest Legal Foundation ("PILF") is a self-described "public interest organization that seeks to promote the integrity of elections nationwide." Appx001. It requested records from the Secretary of the Commonwealth of Pennsylvania to which it contended that it was entitled under the public inspection provision of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507. The Secretary rejected PILF's requests, so PILF sued the Secretary, the Deputy Secretary for Elections and Commissions, and the Bureau of Commissions, Elections and Legislation (collectively the "Secretary") under Section 8 of the NVRA. PILF alleged that it had "suffer[ed] a clear *informational injury* as a direct result of the [Secretary's] violations of the NVRA because the [Secretary] denied [it] access to the records to which it [wa]s entitled under the law." D.C. CM/ECF No. 1 at 34 (emphasis added). Based on this allegation, the District Court concluded that PILF had suffered an "informational injury . . . sufficient to confer Article III standing." *Pub. Int. Legal Found. v. Boockvar*, 370 F. Supp. 3d 449, 456 (M.D. Pa. 2019). We disagree and, therefore, we will vacate and remand.

4

I.

In September 2017, the Secretary disclosed that a "glitch" in a Pennsylvania Department of Transportation ("PennDOT") computer system allowed ineligible persons, including legal permanent residents, also known as green card holders, to register to vote as part of the process of applying for or renewing a driver's license or vehicle registration. D.C. CM/ECF No. 66 at 4. Various media outlets reported about the glitch and the Pennsylvania legislature conducted multiple public investigatory hearings.

On October 23, 2017, the Indiana-based PILF,[1] having learned about this glitch, sent a letter to the Secretary requesting documents under the NVRA, including "all voter records that were referenced in recent news media reports regarding . . . a 'glitch' in PennDOT's Motor Vehicle compliance system." D.C. CM/ECF No. 66 at 6. PILF believed the records would show that "non-U.S. citizens have been registering and voting in Pennsylvania for decades." D.C. CM/ECF No. 1 at 1. To support its request, PILF invoked the "public disclosure" provision of the NVRA, which states:

    (i)    Public disclosure of voter registration activities

        (1)    Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a

---

[1] PILF's Br. 7. Since then, PILF has moved from Indiana to Virginia. *Id.* at 7 n.2.

> reasonable cost, all records
> concerning the implementation of
> programs and activities conducted
> for the purpose of ensuring the
> accuracy and currency of official
> lists of eligible voters, except to
> the extent that such records relate
> to a declination to register to vote
> or to the identity of a voter
> registration agency through which
> any particular voter is registered.

52 U.S.C. § 20507.  PILF followed up on its initial request by letter in December 2017.  On December 20, 2017, the Secretary rejected PILF's request explaining that the Secretary "d[id] not agree that the NVRA entitle[d] [PILF] to access the records." D.C. CM/ECF No. 1-11.

PILF sued the Secretary under 52 U.S.C. § 20510(b), which provides that a "person who is aggrieved" by a violation of Chapter 205 of the NVRA, "may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."  In response, the Secretary filed a motion to dismiss on the grounds, among others, that PILF did not have Article III standing to pursue a claim under the NVRA as it had not suffered an injury in fact, and separately because PILF failed to provide the Secretary with a notice of violation, which is a prerequisite to filing suit.

In February 2019, the District Court dismissed the suit, agreeing that PILF had not provided the Secretary with the required statutory notice, but otherwise concluding that PILF

had standing.    In reaching its decision regarding PILF's standing, the District Court wrote:

> When Congress "elevates intangible harms into concrete injuries," a plaintiff need not allege "any *additional* harm beyond the one Congress has identified."    However, "mere technical violation of a procedural requirement of a statute" that results in no concrete harm is insufficient to establish Article III injury in fact. The Supreme Court has held that "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."

*Boockvar*, 370 F. Supp. 3d at 455 (citations omitted).  As PILF alleged that it was denied records that were purportedly subject to public disclosure under the NVRA, the District Court reasoned that "this denial constitutes an *informational injury*" and PILF had standing.  *Id.* at 455-56 (emphasis added).

Following dismissal of its first suit, PILF served the Secretary with the appropriate notice, and then filed this suit after the Secretary again denied PILF's records requests.  Over the course of the proceedings before the District Court, the Secretary turned over some records to PILF, but not all. Ultimately, the parties filed cross motions for summary judgment.    By this time, the Supreme Court had decided *TransUnion v. Ramirez*, 594 U.S. 413 (2021), which "provid[ed] additional guidance regarding the concreteness requirement" to establish Article III standing.    *Kelly v. RealPage Inc.*, 47 F.4th 202, 211 (3d Cir. 2022).

To resolve the parties' cross motions, the District Court conducted an exacting and rigorous analysis of every category of records at issue and issued a mixed opinion granting and denying both motions in part. In resolving the motions, however, it did not expressly address PILF's standing other than by citing its earlier pre-*TransUnion* opinion in which it concluded that "PILF falls within [the] NVRA's 'zone of interests' and had standing." Appx030. By citing its earlier opinion, the District Court appeared to reaffirm its view that PILF had informational injury standing simply because it failed to receive the information that it requested from the Secretary. *Boockvar*, 370 F. Supp. 3d at 455-56. The District Court otherwise made no mention of *TransUnion* nor its effect, if any, on its standing analysis. As for the merits, it held that PILF was entitled to some records it had requested, other records were not subject to disclosure, still others were protected by privacy concerns or otherwise protected under other statutes, and another category of documents was disclosable but only if redacted. Later, the District Court entered an order awarding fees and costs to PILF as the substantially prevailing party in the litigation.

Both parties appealed the District Court's order granting and denying summary judgment in part. The Secretary appealed the District Court's order awarding fees and costs. Because we conclude that PILF lacks standing, we need not reach the merits of the District Court's ruling.

## II.

The District Court had putative jurisdiction under 28 U.S.C. § 1331. We generally have jurisdiction to review final orders under 28 U.S.C. § 1291, and "we 'always [have]

jurisdiction to determine [our] own jurisdiction.'" *George v. Rushmore Serv. Ctr.*, 114 F.4th 226, 234 (3d Cir. 2024) (alterations in original) (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)).

III.

A.

Questions of law underlying a standing determination are reviewed *de novo*, while factual determinations are reviewed for clear error. *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 414 (3d Cir. 2013). A plaintiff bears the burden of proving the facts establishing standing. *See GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 35 (3d Cir. 2018) (discussing standard of proof for factual disputes regarding subject matter jurisdiction); *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (the "plaintiffs bear the burden of demonstrating that they have standing in the action that they have brought"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "[t]he party invoking federal jurisdiction bears the burden of establishing" his standing). This case presents only questions of law and, therefore, we review the District Court's standing determination *de novo*.[2]

---

[2] While the District Court rendered its decision regarding standing at the pleadings stage and, thus, based its conclusion solely on the allegations contained in PILF's complaint, we will consider the record in its entirety as this case comes to us on appeal from the District Court's order granting in part and denying in part the parties' cross-motions for summary judgment. *See Const. Party of Penn. v. Aichele*, 757 F.3d 347,

Standing is a threshold jurisdictional issue. *See Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 144 (3d Cir. 2023). To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016). An injury in fact exists if a plaintiff has suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). Plaintiff urges that the District Court was correct that the denial of the right to the information, without more, is enough for standing. It relies on the "decades old" precedent in *Public Citizen v. United States Department of Justice*, 491 U.S. 440 (1989) and *FEC v. Akins*, 524 U.S. 11 (1998), which it urges stands for the proposition that it "need [not] show more than that [it] sought and w[as] denied specific agency records." PILF's Br. 20 (quoting *Public Citizen*, 491 U.S. at 449).

In *Public Citizen*, the plaintiffs, the Washington Legal Foundation and Public Citizen, sued the Department of Justice under the Freedom of Information Act ("FOIA") seeking information and documents produced by the American Bar Association's Standing Committee on the Federal Judiciary relating to the nominations of federal judges under the Federal Advisory Committee Act ("FACA"). 491 U.S. at 447-48. While the Department of Justice contested the plaintiffs' standing to sue, the Supreme Court disagreed. *Id.* at 448-49.

---

358 (3d Cir. 2014) (noting that courts consider matters outside the pleadings in evaluating factual attacks to standing).

Faced with a dearth of precedent interpreting FACA, the Supreme Court began its analysis by looking for guidance in its "decisions interpreting the Freedom of Information Act[, which] never suggested that those requesting information under [FOIA] need show more than that they sought and were denied specific agency records." *Id.* at 449-50. It continued explaining that "[t]he fact that other citizens or groups . . . might make the same complaint after unsuccessfully demanding disclosure under FACA does not lessen appellants' asserted injury, any more than the fact that numerous citizens might request the same information under [FOIA] entails that those who have been denied access do not possess a sufficient basis to sue." *Id.* at 449-50. Instead, the Supreme Court noted that the plaintiffs "might gain significant relief if they prevail in their suit," *id.* at 451, as the information and documents they requested were *necessary to their direct and effective participation* in the "judicial selection process," *id.* at 449.

Likewise, in *Akins*, the Supreme Court concluded that the plaintiffs, a group of voters, had standing to sue under the Federal Election Campaign Act of 1971 against the Federal Election Commission seeking documents related to the activity of a purported political committee. 524 U.S. at 13-14. In so concluding, the Supreme Court noted that "the informational injury at issue . . . directly related *to [the plaintiffs'] voting*, the most basic of political rights." *Id.* (emphasis added).

But much has happened in standing jurisprudence since *Public Citizen* and *Akins* were decided, including attempts by various courts to read these cases as requiring more than just the denial of information to have standing. *See, e.g.*, *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020) ("[T]he plaintiffs in *Public Citizen* and *Akins* identified

consequential harms from the failure to disclose the contested information."); *Laufer v. Looper*, 22 F.4th 871, 880-81, 881 n.6 (10th Cir. 2022) ("In *Public Citizen* and *Akins*, the plaintiffs identified . . . adverse effects."); *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 938 (5th Cir. 2022) (same and citing *Looper* with approval); *Grae v. Corrs. Corp. of Am.*, 57 F.4th 567, 570 (6th Cir. 2023) ("The plaintiffs in *Akins* and *Public Citizen* had suffered adverse effects."); *but see Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 169-70 (4th Cir. 2023) (concluding that *TransUnion* "does not extend to the type of informational injury presented in *Public Citizen* and *Akins*"). But whether or not we accept these courts' views of the nature of harm suffered by the plaintiffs in *Akins* and *Public Citizen* as accurate, the real issue here is whether the plaintiff's injury is sufficiently concrete under the Supreme Court's opinion in *TransUnion* and this Court's cases decided since. As noted above, the District Court did not consider *TransUnion* in ruling that Plaintiff had standing.

One can dispute whether *TransUnion* raised the bar in terms of the adverse consequences that must be alleged to satisfy the standing requirements in different statutory settings. *See generally Huber*, 84 F.4th at 158-66 (Rendell, J., concurring in part, dissenting in part). But it set the standard we must follow. And under the Supreme Court's standard, statutory context is important. Here, as in *TransUnion*, we are presented with a statute with a purpose that goes farther than government transparency such as FOIA. The required disclosure of certain records is merely one aspect of the statutory scheme in service of a greater purpose—that is, as we explain below, *the expansion of voter participation in federal elections*.

In *TransUnion*, a purported class of consumers alleged that TransUnion violated the Fair Credit Reporting Act ("FCRA") by improperly flagging the consumers as possible terrorists. 594 U.S. at 432. Some of the consumers' allegedly improper credit reports had been disseminated to third parties, while other consumers' reports had not. *Id.* at 417. After a jury trial, which resulted in a verdict in favor of the plaintiffs and an award of more than $60 million in damages, TransUnion appealed to the Ninth Circuit. *Id.* at 421-22. On appeal, TransUnion argued that the verdict should be set aside because not all the plaintiffs in the class had Article III standing. *Id.*; *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1022 (9th Cir. 2020). The Ninth Circuit broadly rejected this argument, but the Supreme Court disagreed because at least some of the plaintiffs' claimed injuries were not sufficiently concrete to establish standing. *See TransUnion*, 594 U.S. at 418.

In reaching its conclusion, the Supreme Court clarified that "[c]entral to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms . . . ." *Id.* at 414 (quoting *Spokeo*, 578 U.S. at 341). Thus, the Supreme Court concluded that those plaintiffs whose credit records were disseminated to third parties and contained inaccurate information had standing because their harms bore a close relationship to "the reputational harm associated with the tort of defamation." *Id.* at 432. By contrast, those plaintiffs whose credit records were not disseminated to third parties had no standing despite containing inaccurate information. *Id.* at 438.

The Supreme Court proceeded to reject an alternative argument in favor of plaintiffs' standing—the same argument advance by PILF in this case—"that the plaintiffs suffered a concrete 'informational injury' [that was sufficient] under several of th[e] Court's precedents," namely *Public Citizen* and *Akins*. *Id.* at 441. The Supreme Court disagreed, reasoning that "[t]he plaintiffs did not allege that they failed to receive any required information," and therefore, had not suffered an informational injury. *Id.* The Court further observed that *Public Citizen* and *Akins* were distinguishable because those cases involved "information subject to public-disclosure or sunshine laws," *id.*, whereas the FCRA was not such a public-disclosure or sunshine law. Moreover, it noted that "the plaintiffs [in *TransUnion*] . . . identified no 'downstream consequences' from failing to receive [any] required information." *Id.* at 442 (citing *Trichell*, 964 F.3d at 1004). "An asserted informational injury that causes no adverse effects cannot satisfy Article III." *Id.* (internal quotation marks omitted). We take this to mean that if disclosure of information is the essence of a statute, as it is in FOIA,[3] standing would easily be met because public availability of information is itself the interest that Congress seeks to protect under such statutes. *See Kelly*, 47 F.4th at 213 (discussing the relationship or nexus requirement between a purported adverse effect and the

---

[3] *See generally McDonnell v. United States*, 4 F.3d 1227, 1238 (3d Cir. 1993) ("FOIA 'is *fundamentally* designed to inform the public about [federal] agency action . . . .") (quoting *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 144 n.10 (1975)) (emphasis added); *Nat'l Sec. Archive v. Cent. Intel. Agency*, 104 F.4th 267, 273 (D.C. Cir. 2024) (discussing the objective of the FOIA as providing access to government records).

interest protected by the statute).  Here, all parties agree that Congress's purpose in enacting the NVRA targets an objective much broader and more expansive than access to records. Thus, we will proceed to consider *TransUnion*'s impact on PILF's alleged injury in fact.

The year after the Supreme Court's decision in *TransUnion*, we had occasion in *Kelly* to consider its effect on the "informational injury doctrine."  47 F.4th at 211.  We observed that "the Court did not amend the . . . doctrine . . . ; rather, it simply applied its prior precedent [to the case before it] and determined that two critical requirements for establishing an informational injury were lacking:  (1) the denial of information and (2) *some consequence caused by that omission*."  *Id.* at 213 (emphasis added).  "In the wake of *TransUnion*, other Courts of Appeals have . . . concluded that 'depriv[ation] of information to which [one] is legally entitled' constitutes a sufficiently concrete informational injury *when that omission causes 'adverse effects'* and the information has 'some relevance' to an interest of the litigant that *the statute was intended to protect*."  *Id.* (alterations in original) (emphasis added) (quoting *Looper*, 22 F.4th at 880-81 n.6); *see also Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 308 (2d Cir. 2024) (requiring a "causal connection" between a purported violation of a statute and a "downstream harm"); *Trichell*, 964 F.3d at 1004 (collecting cases and agreeing that "an asserted informational injury that causes no adverse effects cannot satisfy Article III").  Thus, we said that "the Supreme Court in *TransUnion* simply reiterated the lessons of its prior cases: namely, to state a cognizable informational injury a plaintiff must allege that they failed to receive . . . required information, and that the omission led to adverse effects or other downstream consequences, *and such consequences have a*

*nexus to the interest Congress sought to protect.*" *Kelly*, 47 F.4th at 214 (emphasis added) (internal quotation marks and citations omitted); *George*, 114 F.4th at 235, 236 (same); *Huber*, 84 F.4th at 145 n.2 (same).

We explained that "[w]hether framed as 'adverse effects' or a 'downstream consequence[],' the upshot is the same: a plaintiff seeking to assert an informational injury must establish *a nexus* among the omitted information to which she has entitlement, the purported harm *actually caused* by the specific violation, and *the 'concrete interest'* that Congress identified as 'deserving of protection' when it created the disclosure requirement." *Kelly*, 47 F.4th at 213 (alteration in original) (emphasis added) (citation omitted) (citing *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1100 (9th Cir. 2022)). That is, it is insufficient for Article III standing purposes for a plaintiff asserting an informational injury from a violation of a statute that contains a public disclosure aspect as part of its overall scheme to allege only that he has been denied information.[4] Rather, he must establish a nexus among a downstream consequence, his alleged harm, and the interest Congress sought to protect. Without such a nexus, a plaintiff can claim no informational injury standing.

The Secretary urges that the Fifth Circuit's opinion in *Scott* should be our guide because, in that case, the denial of disclosure of documents to which the plaintiffs—a group of civic engagement organizations—were arguably entitled under

---

[4] As noted above, we do not read *TransUnion* to impose this requirement in cases involving "sunshine laws" statutes aimed solely at disclosure of information. *See TransUnion*, 141 S. Ct. at 2215.

the NVRA was squarely presented.  While we take no position regarding the merits of that case and the result reached by the Fifth Circuit, we acknowledge the framework that the *Scott* court employed is like our own under *Kelly*.

In *Scott*, the district court held that the plaintiffs had suffered a concrete and particularized harm given "the NVRA's public disclosure requirement[, which is] backed by a citizen suit provision and . . . *downstream consequences*, including the lack of an opportunity for [the plaintiffs] to identify eligible voters improperly flagged," by the state's program.  49 F.4th at 935 (internal quotation marks omitted) (emphasis added).

On appeal, the plaintiffs urged the Fifth Circuit to uphold the district court's standing analysis and decision.  *Id.* They contended that as "civic engagement organizations" they had standing to access the records they requested under the NVRA and the Secretary's refusals resulted in "downstream injury" because without such access, they could not "identify eligible voters improperly flagged" by the state's voter roll maintenance program, *id.* at 935-36, thereby thwarting their ability to scrutinize "how Texas is keeping its voter lists," *id.* at 936.  Moreover, the organizations argued, "there is [a] downstream injury with respect to the public not having visibility into . . . properly registered Texans being discriminated against and burdened in their right to vote." *Id.* (alteration in original).  The Fifth Circuit disagreed.

It concluded that the organizations "offered no meaningful evidence regarding any downstream consequences from an alleged injury in law under the NVRA." *Id.* at 937.  In particular, the Fifth Circuit explained that while the NVRA

creates "a statutory right of the public to the 'visibility' of the Secretary's process," nothing suggested any "concrete and particularized harm to these Plaintiffs from not obtaining the requested personal voter information." *Id.* And while the plaintiffs complained of a "lack of 'opportunity' to identify voters incorrectly described by the Secretary's data base," the Court concluded that this purported downstream consequence was too speculative to constitute a "concrete grievance." *Id.* That "not a single Plaintiff is a Texas voter, much less a voter wrongfully identified as ineligible, and the Plaintiffs have not claimed organizational standing on behalf of any Texas voter members," the Court further reasoned, belied the plaintiffs' claim to standing. *Id.*

In reaching this conclusion, the Fifth Circuit rejected the plaintiffs' reliance on *Public Citizen* and *Akins* "for the proposition that 'the violation of a procedural right granted by statute can be sufficient . . . to constitute injury in fact . . . [without] alleg[ing] any *additional* harm beyond the one Congress has identified." *Id*. at 938. The Fifth Circuit observed, as we did in *Kelly*, that while the Supreme Court in *TransUnion* cited to *Public Citizen* and *Akins* "involv[ing] [the] denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information," it nevertheless required the plaintiff in *TransUnion* to "identif[y] . . . 'downstream consequences' from failing to receive the required information" to establish standing. *Id.* (quoting *TransUnion*, 594 U.S. at 442). Indeed, the Fifth Circuit continued, the plaintiffs "in both *Akins* and in *Public Citizen* . . . had *actually asserted 'downstream consequences'* since they needed the information in order *to participate directly and actively in . . . the electoral . . . process*[]." *Id.* (emphasis added) (citing *Trichell*, 964 F.3d at

1004).  That is, as we said in *Kelly*, the harms suffered by the plaintiffs in those cases bore a nexus to the harms that the statutes were designed to prevent.  The Fifth Circuit concluded "even in public disclosure-based cases, plaintiffs must and can assert 'downstream consequences,' which is another way of identifying concrete harm from governmental failures to disclose."  *Id*.  The Fifth Circuit believed that on the facts before it, the "civic engagement organizations" did "not allege that identification of voter names and identification numbers w[ould] directly lead to action relevant to the NVRA . . . nor that their direct participation in the electoral process w[ould] be hindered."  *Id*. at 936, 938.  Thus, the plaintiffs could not establish a nexus among any harm they purportedly suffered to a harm that Congress sought to prevent in passing the NVRA.

While one might question the Fifth Circuit's characterization of the alleged harm suffered by the plaintiffs in *Scott* and its relevance to their participation in the electoral process under the NVRA, the Fifth Circuit's standing analysis, like our own under *Kelly*, rightly focuses on whether the plaintiff has alleged that it has suffered sufficient "adverse effects" or other "downstream consequence" having *a nexus* to an interest Congress sought to protect in passing the NVRA.  Thus, to address PILF's standing, we must understand the purpose of the NVRA as well as the interest PILF urges has been harmed by the Secretary's actions.

### B.

We have observed that Congress enacted the NVRA principally because it "was wary of the devastating impact [voter roll] purging efforts previously had on the electorate."  *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 178 (3d

Cir. 2017); *see also Welker v. Clarke*, 239 F.3d 596, 598-99 (3d Cir. 2001) (noting that "[o]ne of the NVRA's central purposes was to dramatically expand opportunities for voter registration"); *Ortiz v. Phila. Off. of City Comm'rs Voter Regis. Div.*, 28 F.3d 306, 318 (3d Cir. 1994) (Scirica, J., concurring) ("For some time now, Congress and the state legislatures, concerned by low voting rates, have commendably *sought to increase voter participation*. . . . [C]iting a steady decline of citizen participation in federal elections . . . Congress decided to promote voter registration by passing the [NVRA]." (emphasis added)). Indeed, "Congress noted that . . . 'there is a long history of such cleaning mechanisms [being] used to violate the basic rights of citizens" to vote. *Am. C.R. Union*, 872 F.3d at 178 (alteration in original) (quoting S. Rep. No. 103-6, at 18 (1993)). By its own terms, the NVRA seeks:

(1)  to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2)  to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3)  to protect the integrity of the electoral process; and

(4)  to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b). Thus, the statute aims at increasing citizen participation in federal elections. While the statute provides for public inspection of "records concerning the

implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," *id.* § 20507(i), and contains a remedial provision with a right to sue, after *TransUnion* and *Kelly*, more in the way of concrete harm and, in particular, proof of a nexus is required for PILF to have standing to sue under a theory of informational injury.

To support its position that it has standing, PILF urges that it "has suffered three primary 'adverse effects' or 'downstream consequences' resulting from the Secretary's refusal to provide the required information," which bear a nexus with concrete interests that Congress intended to protect under the NVRA. PILF's Br. 26. First, it urges that it "cannot 'study and analyze the [Secretary's] voter list maintenance activities." PILF's Br. 26 (alteration in the original) (quoting D.C. CM/ECF No. 66 ¶ 3). This hampers its "activity . . . to promote election integrity and compliance with federal and state statutes." PILF's Br. 27 (quoting D.C. CM/ECF No. 1 ¶ 135) (quotation marks omitted). Second, "the Commonwealth's actions frustrate . . . [t]he Foundation's . . . produc[tion] and disseminat[ion] [of] educational materials." PILF's Br. 27. Third, in seeking records from the Secretary, PILF "expended considerable time and financial resources." *Id.*

With respect to "study and analysis," PILF contemplates general activity "to promote the integrity of elections nationwide," through the production and dissemination of "educational materials." Neither of these activities is essential to a concrete interest protected by the statute as was the case in *Public Citizen* and *Akins*." Appx001. That is, there is an insufficient nexus among the downstream

consequences identified by PILF and the interest that Congress sought to protect.  To "study and analyze" and "scrutinize" records, PILF's Br. 26, is not an enumerated purpose of the NVRA nor do these aims advance the expansion of voter registration and participation in federal elections.  Further, PILF offers no explanation of how its inability to study and analyze and scrutinize the requested records has hindered its own participation in the electoral system or the expansion of voter participation in federal elections in Pennsylvania generally.  Indeed, that PILF has no ties to Pennsylvania or any of its voters undercuts its position that the Secretary's actions as to PILF resulted in any harm to those who Congress sought to protect in enacting the NVRA.

Although PILF contends that without the records it "cannot effectively evaluate the accuracy of the Commonwealth's voter rolls nor the effectiveness of investigation and remedies undertaken by the Commonwealth in response to the PennDOT" glitch, PILF's Br. 32, nor can it "compel compliance with state and federal voter list maintenance laws," PILF's Br. 26 (quotation omitted), its desire to have such records for these purposes does not entitle it to sue.

Separate and apart from whether PILF has informational injury standing, it bears repeating that, as a general principle of constitutional standing, as we explained in *Huber*, while a statute may authorize private suits to compel compliance with the law, private citizens are not deputized as private attorneys general empowered to enforce any and all violations of a statute without regard to their personal stake in the matter.  *Huber*, 84 F.4th at 147. ("[I]n contrast to federal agencies empowered to enforce statutory rights, '[p]rivate

plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law.'" (second alteration in original) (quoting *TransUnion*, 594 U.S. at 429)).  As admirable as PILF's mission may be, PILF is not an attorney general with general standing to enforce the provisions of the NVRA in the absence of proof that it maintains a personal and constitutionally significant stake in the matter.

Returning to PILF's claim of informational injury standing, we further reject its argument that the "frustrat[ion] [of] the *educational aspect* of its mission," and its inability to publish "educational materials," PILF's Br. 27, constitute downstream consequences envisioned by the statute sufficient to establish Article III standing because the publication of educational materials bears no nexus to an interest protected by the statute.  And even if it did, PILF offered no proof that its ability to produce and disseminate such educational materials was actually hampered by the Commonwealth's alleged violation of the NVRA.

First, as we explained above, the facilitation and creation of educational materials is not a purpose of the NVRA.  Thus, even if we assumed that the Secretary's actions actually hampered PILF's ability to publish such materials, such harm has no "'nexus to the concrete interest Congress intended to protect' by requiring disclosure of the information." *George*, 114 F.4th at 236 (quoting *Kelly*, 47 F.4th at 214).  Second, there is no evidence in the record that, despite the Secretary's purported noncompliance with the NVRA, PILF was unable to publish educational materials.  Indeed, PILF touted its ability to publish, among other things, "a report focused on noncitizen registration and voting in Allegheny County," which was made

possible based on records it obtained from county-level and municipal sources. PILF's Br. 27. On this record, the Secretary's actions did not appear to affect PILF's ability to access any resources that it had previously and successfully used to generate its educational materials.

We also note that PILF submitted no evidence of any specific plans for the records it sought relating to the purpose of the NVRA. *Cf. Scott*, 49 F.4th at 940 (Ho, J., concurring) (suggesting that proof that the defendant's hindrance of "Plaintiffs' mission to *protect the voting rights* of various communities" might suffice as a downstream consequence under the NVRA (emphasis added)). Without evidence that PILF had "concrete plans to imminently pursue a desired course of action" bearing a nexus to an interest Congress sought to protect that was hindered only by the Secretary's refusal to turnover the records, PILF has no standing. *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 207 n.5 (3d Cir. 2021). This is because such "inchoate plans for future programs" of a general nature are insufficiently concrete for Article III purposes. *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998). A general desire to audit a state's NVRA records without concrete plans to act upon information contained in the records in a manner consistent with the purpose of the statute does not establish standing under *TransUnion* and *Kelly*.

Finally, we reject PILF's third argument, namely that it has suffered adverse effects or downstream consequences simply by having "expended considerable time and financial resources" to vindicate its rights and hold the Secretary accountable under the NVRA. PILF's Br. 27. "An organization that has not suffered a concrete injury caused by

a defendant's action cannot spend its way into standing simply by expending money to gather information . . . . An organization cannot manufacture its own standing in that way." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024); *see also Blunt*, 767 F.3d at 285 ("[O]rganizations may not satisfy the injury in fact requirement by making expenditures solely for the purpose of litigation . . . nor by simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." (citations omitted)). To hold otherwise would render Article III standing meaningless. *See FDA*, 602 U.S. at 394.

In short, as an out-of-state "public interest organization," that has adduced insufficient evidence of a nexus among any adverse effect or downstream consequence and a harm it has suffered because of the Secretary's refusal to provide access to the requested records under *TransUnion* and its progeny, PILF has no standing to sue. PILF does not represent any Pennsylvania citizens who have been affected by the Secretary's purported violation of the NVRA. It has no direct ties to Pennsylvania voters and has not alleged how access to the records it seeks would "directly lead to action" or that *its* "direct participation in the electoral process [has been] hindered." *Scott*, 49 F.4th at 938; *cf. Akins*, 524 U.S. at 27 (concluding that the plaintiffs "*as voters*, have satisfied both prudential and constitutional standing requirements" (emphasis added)). It has not suffered any concrete harm. And as the Supreme Court has proclaimed: "No concrete harm, no standing." *TransUnion*, 594 U.S. at 417.

To be clear, although plaintiffs at the summary judgment stage "must set forth 'specific facts' by affidavit or other evidence" supporting standing, *Pa. Prison Soc. v. Cortes*,

508 F.3d 156, 161 (3d Cir. 2007) (quoting *Lujan*, 504 U.S. at 561)), the requirement of a downstream consequence required by *TransUnion* is "not . . . burdensome," *Scott*, 49 F.4th at 940 (Ho, J., concurring).   Here, PILF does not clear even that low evidentiary hurdle because it failed to identify some *specific* adverse downstream consequence for its mission or future plans that has a nexus to the interest Congress sought to protect in enacting the NVRA, namely the expansion of voter participation in federal elections.   *See* Section III.B., *supra*, at 18-19 (discussing Congress's interest).   "[W]e cannot infer adverse effects" from this threadbare record because "doing so would vitiate the second prong of *Kelly*."   *George*, 114 F.4th at 236 n.12.

## C.

"Because we conclude that [PILF] lacked standing from the very outset, we must vacate the District Court's order[] and remand with instructions to dismiss [PILF's] case."   *George*, 114 F.4th at 230.   This is because "[a] lack of jurisdiction 'voids any decree entered in a federal court.'"   *Id.* at 239; *see also TransUnion*, 594 U.S. at 442 (reversing and remanding in the face of a jury verdict and award of damages).   Thus, the District Court's order awarding attorneys' fees, which was based upon the District Court's void order entering judgment in favor of PILF, is also void.

## IV.

For these reasons, we will vacate the District Court's orders and remand with instructions to the District Court to dismiss the case.